

Signed and Filed: November 21, 2018

_____
**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | ) Case No. 17-30013 HLB |
| | ) |
| JEFFREY HALL KAFKA, | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| _____ | ) |
| GREG SAVIN and SHAWN RHODES, | ) |
| | ) Adv. Proc. No. 17-03060 HLB |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| JEFFREY HALL KAFKA, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

### MEMORANDUM DECISION AFTER TRIAL

**I.   INTRODUCTION**

This case came before the court on September 10 and 11, 2018 for trial on Plaintiffs Greg Savin and Shawn Rhodes' Complaint for Equitable Relief and Determination of Dischargeability of Debt [Dkt. 1; the "Complaint"].  In their complaint, Messrs. Savin and Rhodes seek a judgment declaring that (a) they and Defendant Jeffrey Kafka are partners in a general partnership ("NorCal KRS" or "NorCal Burlingame") that owns real property located at 1101 Douglas Avenue in Burlingame, California (the "Property"); or (b) Messrs. Savin and Rhodes each own a one-third interest in the Property.  Messrs. Savin and Rhodes also seek a

judicial dissolution of their partnership, judicial supervision over the winding up of the partnership including an accounting, and a judgment liquidating and awarding damages against Mr. Kafka for alleged misrepresentations, breach of fiduciary duty, and misappropriation of partnership assets and declaring those damages nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).[1]

Mr. Kafka filed an answer and counter claim asserting alter ego and agency liability, with claims against Messrs. Savin and Rhodes for breach of contract, conversion, breach of co-tenant obligations, and damages therefrom. The court bifurcated the issues to be tried, first addressing the claim for declaratory relief regarding the parties' respective interests in the Property, and staying the adversary proceeding as to all other claims for relief. [Order Bifurcating Issues to Be Tried, Continuing Status Conference, and Setting Deadlines; Dkt. 14.] So, the only issue before the court at trial was the ownership of the Property.

Mr. Stephen Finestone appeared on behalf of Messrs. Savin and Rhodes. Mr. Peter Winkler appeared on behalf of Mr. Kafka. After both sides presented their testimony and evidence, the court took the matter under submission.

This memorandum decision constitutes the court's findings of facts and conclusions of law as required by Rule 52(a)(1) of the

---

[1] Unless otherwise indicated, all statutory citations shall refer to Title 11 of the United States Code, aka the "Bankruptcy Code." All citations to rules shall refer to the Federal Rules of Bankruptcy Procedure.

Federal Rules of Civil Procedure, which applies in this proceeding pursuant to Rule 7052.

## II.  JURISDICTION

The court has jurisdiction over this bifurcated claim for relief pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and General Order 24 of the United States District Court for the Northern District of California, as confirmed by the parties' express consent to entry of a judgment by this court.  [See Complaint, ¶ 1; Declaration of Jeffrey Kafka Consenting to Final Judgment in Adversary Proceeding, Dkt. 24.]  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(O).  Venue is proper under 28 U.S.C. § 1409(a).

## III. FINDINGS OF FACT

### a. Background

The parties grew up together in Pacifica, California.  All three are avid surfers, although Mr. Kafka also became seriously involved in kite boarding.

Messrs. Savin and Rhodes became friends in high school and often surfed together.  Neither went to college, and in 1991 they opened NorCal Surf Shop (the "Surf Shop") in Pacifica as equal partners.  They made surf boards and sold surf-related merchandise.  Their partnership began informally – all agreements were made orally or based on a handshake.  Because Mr. Savin became a fire fighter for the San Francisco Fire Department shortly after they opened the Surf Shop, Mr. Rhodes managed most of the hands-on, day-to-day work at the Surf Shop while Mr. Savin handled the bookkeeping and accounting.  In 2005, Messrs. Savin and Rhodes incorporated the Surf Shop as NorCal Brand, Inc.

("NorCal Pacifica"). NorCal Pacifica is a successful business and continues to operate to this day.

Mr. Kafka came to know Messrs. Savin and Rhodes in high school and through surfing. He attended College of San Mateo after high school, but left prior to earning a degree to work for AT&T, where he spent approximately ten years as a line splicer. During this time, he started kite boarding, and in 2004 he opened Wind Over Water Kiteboarding LLC ("WOW") in Burlingame, California. Through WOW, he provided kite boarding lessons and excursions, and sold related merchandise. WOW is also a successful business and continues to operate to this day.

Sometime in 2005 or 2006, Mr. Rhodes and Mr. Kafka started discussing opportunities to jointly expand NorCal Pacifica and WOW. Mr. Rhodes testified that he had been looking at locations in Burlingame; knew that Mr. Kafka was "the main guy" for kite boarding; and concluded that Mr. Kafka's reputation and existing presence in Burlingame seemed a perfect fit for a joint venture. Mr. Kafka knew that NorCal Pacifica was doing well, and believed expansion was a good idea. Messrs. Savin, Rhodes, and Kafka agreed to go into business together to open a surf shop location in Burlingame.[2]

After looking at commercial rental properties, they determined that it made more sense to buy a property than to lease premises, as rents were so high ($10,000 - $15,000 per month for the spaces they were viewing) that cost of ownership

---

[2] According to Mr. Kafka, Mr. Rhodes wanted to franchise NorCal Surf Shop. Mr. Rhodes did not address this point. The court does not find this distinction relevant to the issues at hand.

could be cheaper.  Mr. Kafka found the Property, which had both

residential and commercial spaces, and told Mr. Rhodes about it.

Mr. Rhodes believed it was the best location he had seen.

Mr. Phil Savin (Greg Savin's father, to whom the court will refer

as "Mr. Phil Savin" for clarity) provided $65,000, which was used

as a down payment.  Mr. Kafka also borrowed funds from JPMorgan

Chase Bank, N.A. ("Chase") in the form of two loans, each of

which was secured by the Property, pursuant to deeds of trust.[3]

After the close of escrow on May 21, 2007,[4] Mr. Kafka held title

to the Property.

Just days later, on May 24, 2007, the parties incorporated

their business as NorCal KRS, Inc. ("NorCal KRS").  [Ex. 6.]  The

parties each held an equal one third share of NorCal KRS.  [Ex.

7.]  Mr. Kafka took the role of President, Mr. Rhodes became

Secretary, and Mr. Savin became Treasurer.  [Id.]

The parties began to renovate the Property, which took about

six months.[5]  While the renovations proceeded, NorCal KRS paid

all the carrying costs (payments on the first and second deeds of

trust in favor of Chase, interest payments to Mr. Phil Savin,

[3] On May 5, 2011, Chase assigned the first deed of trust to Bank of New York
Mellon Trust Company, N.A., which filed Proof of Claim 10-1 in Mr. Kafka's
underlying bankruptcy case.  Because the parties referred only to Chase during
trial, the court will continue to do so for the sake of simplicity.

[4] See Ex. 2 (First American Title Company Final Statement).

[5] The parties gave inconsistent testimony concerning who paid for the
renovations.  Mr. Savin testified that they each contributed funds; Mr. Rhodes
testified that he did 60% of the construction labor with no pay, that NorCal
Pacifica paid for most of the materials and outside labor, and that all three
parties incurred credit card debt; Mr. Kafka testified that he paid for
landscaping done by his uncle, and NorCal KRS or NorCal Pacifica paid for the
remainder of the work.  The court finds these inconsistencies immaterial to
its determination as to ownership of the Property.

property taxes, insurance, repairs, and maintenance) associated with the Property.[6]

In November 2007, NorCal KRS borrowed an additional $50,000 from Mr. Phil Savin for, according to Mr. Savin, operating expenses. In December 2007, NorCal KRS (operating as NorCal Surf Shop) opened for business in the commercial space, and Mr. Rhodes' cousin, Mr. Nathan Rhodes, moved into the residential space. Mr. Rhodes testified that Mr. Nathan Rhodes paid rent to NorCal KRS. The business began successfully, but between the 2008 financial crisis and a competitor opening a nearby store, it began to fail.

By May 2010, NorCal KRS had stopped making payments to Chase on account of the loan secured by the first deed of trust. [Ex. 32 (QuickBooks printout for NorCal Burlingame of all transactions for Chase Home Finance).] It made payments to Chase on the loan secured by the second deed of trust, as well as payments to Mr. Phil Savin, through February 2011. [Exs. 31 and 30 (QuickBooks printout for NorCal Burlingame of all transactions for Chase line of credit and for Mr. Phil Savin, respectively).] After February 2011, NorCal KRS did not make any further payments to Chase, Mr. Phil Savin, or for any other Property-related expenses.

NorCal KRS closed its doors in December 2010 or January 2011 and vacated the Property. The parties signed a Certificate of Election to Wind Up and Dissolve NorCal KRS on December 16, 2011. [Ex. 19.]

---

[6] According to Messrs. Savin and Rhodes, NorCal Pacifica made these payments on NorCal KRS's behalf, and as a result, by 2010 NorCal KRS owed NorCal Pacifica $283,720, a debt it never repaid. See Ex. 17 at 2 (NorCal KRS balance sheet dated October 1, 2011).

After NorCal KRS moved out, Mr. Rhodes and Mr. Kafka worked
together to find a new commercial tenant and to modify the loan
secured by the first deed of trust, under which Chase was
threatening foreclosure. Unable to find a viable tenant, Mr.
Kafka moved WOW into the commercial space and eventually moved
his family into the residential space. Mr. Kafka continued to
pay the loan secured by the second deed of trust,[7] but did not
pay the loan secured by the first deed of trust because Chase
refused to accept payments while he pursued the loan modification
process. Ultimately, Chase began non-judicial foreclosure
proceedings. Mr. Kafka went to great lengths to avoid
foreclosure, but eventually filed the underlying bankruptcy case
on January 4, 2017 to stop a trustee's sale of the Property
scheduled for the next day. [Status Conference Statement, Dkt.
42, ¶ 3, In re Kafka, 17-30013 (Bankr. N.D. Cal.)]

Meanwhile, relationships between the parties began to sour.
At some point it became apparent to Messrs. Savin and Rhodes that
Mr. Kafka believed the Property belonged to him alone, whereas
they believed that the three of them owned the Property equally,
as partners. Messrs. Savin and Rhodes filed suit against Mr.
Kafka in state court.[8] Mr. Kafka claimed that he did not know

---

[7] Mr. Kafka did not provide any evidence of these payments. The court
observes, however, that Chase filed a proof of claim in Mr. Kafka's underlying
bankruptcy case. That claim reflects six payments on the claim secured by the
second deed of trust between March 2012 and July 2012. [Proof of Claim No.
11-2.] On March 9, 2018, Chase withdrew its proof of claim, indicating that
it had canceled the debt, considered the claim satisfied as of the date of the
withdrawal, and would be "releasing the lien on the mortgage loan."
[Withdrawal of Claim, Dkt. 128, In re Kafka, 17-30013 (Bankr. N.D. Cal.).]

[8] Shawn Rhodes et al. v. Jeffrey Kafka et al., case no. 16-CIV-00209, San
Mateo Superior Court; filed on June 29, 2016.

that Messrs. Savin and Rhodes asserted interests in the Property until they filed suit.  The state court proceeding has been stayed pending Mr. Kafka's bankruptcy case.

### b. Messrs. Savin and Rhodes' Version of Events

Messrs. Savin and Rhodes testified as witnesses, as did Mr. Phil Savin and Mr. Kafka.  Mr. Kafka did not introduce any exhibits or any evidence beyond his testimony at trial.  Messrs. Savin and Rhodes introduced multiple exhibits.[9]

According to Messrs. Savin and Rhodes, the parties always intended that NorCal KRS would own the Property.  Prior to the purchase of the Property, they and Mr. Kafka met with Thomas Neece, a real estate broker, and Daniel Deliz, a real estate agent, to discuss their financial options.  Because Mr. Savin had just refinanced his home, and Mr. Rhodes was building a home, Mr. Kafka appeared the most credit-worthy for purposes of obtaining financing, so they decided that Mr. Kafka would buy the Property in his name.

None of them had enough money for a down payment, so they agreed to borrow that money from Mr. Phil Savin.  They understood that all three of them would own the Property through NorCal KRS; that NorCal KRS would pay all the expenses associated with the Property; that, at a future date, NorCal KRS would pay off the existing loans in Mr. Kafka's name through a refinance, after which Mr. Kafka would transfer the Property to NorCal KRS.

---

[9] The court admitted Messrs. Savin and Rhodes' exhibits 1, 2, 4-15, 17-41, and 42-44 (as to designated portions of testimony and related exhibits).  The court also admitted portions of their exhibit 46 and all of their exhibit 47 for purposes of impeachment.

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 8 of 30

According to Messrs. Savin and Rhodes, the parties'
California Residential Purchase Agreement and Joint Escrow
Instructions (the "Purchase Agreement") [Ex. 1] generally
corroborates this version of events because it identifies the
buyer as "Jeff Hall Kafka [Et Al]." [Id.] Mr. Rhodes testified
that Mr. Neece prepared the Purchase Agreement and inserted the
"[Et Al]" so that other names could be added as purchaser.

Mr. Neece's deposition testimony also corroborates Messrs.
Savin and Rhodes' story, as he describes the same meeting,
discussion, and decisions [Ex. 43 at 12:1-13:9; 16:12-25; 17:1;
23:5-17; 25:1-13] to which they testified. He also explains that
the purpose of adding "[Et Al]]" to the Purchase Agreement was to
allow Messrs. Savin and Rhodes to be added to the contract if
needed. [Id. at 17:6-25; 18:1-12.]

Messrs. Savin and Rhodes' version of the parties'
understanding, and agreement finds further support in a letter
from attorney John McGrath dated May 7, 2007 – near in time to
the purchase of the Property – and addressed to Messrs. Savin,
Rhodes, and Kafka. [Ex. 4.] Mr. McGrath states:

> It was a pleasure speaking with you all. As I understand
> it the three of you would like to join together to form
> a corporation to open NorCal Surfshop of Burlingame . .
> . . I understand that you will be equal partners, sharing
> equally in profit and losses, and that the business will
> own the real estate wherein it will be located.

[Id. at 1.]

Moreover, Jeremiah Johnson, General Manager of NorCal
Brands, Inc., testified in deposition to his understanding, based
on his discussions with Mr. Rhodes prior to the purchase, that
the Property was acquired on behalf of NorCal KRS because it made

more sense to buy a property than pay the higher cost of renting one [Ex. 44 at 27:19-28:7; 40:11-22]. He also understood, based on discussions he had with either Mr. Savin, Rhodes, and/or Mr. Kafka around the time of the purchase, that Mr. Kafka held title to the Property because he was the only one of the three who could qualify for a loan. [Id. at 26:19-27:18.] The court finds Mr. Johnson's deposition testimony credible. He has known Mr. Kafka since elementary school and considers Mr. Kafka a friend, suggesting a lack of bias against Mr. Kafka. [Id. at 11:18-12:8.] Furthermore, Mr. Johnson worked with Mr. Rhodes at Nor Cal Pacifica prior to and during the expansion into Burlingame and he testified that Mr. Rhodes discussed the expansion with him. [Id. at 21:15-18.]

Mr. Phil Savin's trial testimony also corroborates the Plaintiffs' story. Mr. Phil Savin testified that Mr. Savin told him that they wanted to buy the Property rather than lease a similar property and asked for a loan of $65,000 to serve as a down-payment, which would help Mr. Kafka qualify for a loan. He understood that the Property would be titled in Mr. Kafka's name but owned in part by Mr. Savin. Mr. Phil Savin met Mr. Kafka for the first time when he gave Messrs. Kafka, Savin, and Rhodes his $65,000 check. This loan bore interest at 5.5% but had no maturity date, because Messrs. Kafka, Savin, and Rhodes intended to refinance the Property and repay Mr. Phil Savin in full. Most important, Mr. Phil Savin stated unequivocally and very credibly that he would not have lent the $65,000 if he knew that Mr. Kafka would claim that he alone owned the Property.

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 10 of 30

According to Messrs. Savin and Rhodes, after the purchase of the Property, the parties still intended that NorCal KRS eventually would own it.  Consistent with this understanding, NorCal KRS made the loan payments, paid for insurance, made interest payments to Mr. Phil Savin, and paid all other costs associated with the Property.

NorCal KRS's 2008-2010 tax returns also support this understanding, as they claim the Property as an asset and claim related depreciation and expense deductions.  [Exs. 12, 14-15.] NorCal KRS's balance sheet as of October 1, 2011 also lists the Property as an asset.  [Ex. 17.]  Mr. Savin and Mr. Rhodes understood that Mr. Kafka received copies of NorCal KRS' tax returns and never complained that NorCal KRS claimed ownership of the Property therein.  Mr. Kafka admitted that the three parties met roughly once a month to review balance sheets and other financials reports.

The parties appear to have taken other steps to follow through on their understanding.  For example, according to a letter dated December 28, 2007 from attorney John McGrath and addressed to Messrs. Savin, Rhodes, and Kafka [Ex. 5], the parties were considering converting NorCal KRS Inc. to a limited liability company, and that "the thinking was to have the LLC own both the business and the real property."  [Id.]  Emails from Norman Hotz of International Business Consulting to Messrs. Savin, Rhodes, and Kafka, dated March 20 and 30 2008, provide evidence of the parties' efforts to refinance the purchase money debt, as they prove that the parties retained Mr. Hotz to help them secure new financing and that he provided updates regarding

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 11 of
30

his progress toward that end. [Exs. 25-26.] The parties never succeeded in obtaining refinancing.

After NorCal KRS closed and moved out of the Property, Messrs. Savin and Rhodes still believed they were putative co-owners of the Property. All three men were concerned about how to pay for the Property and worked to modify the original loan and to locate a tenant for the commercial space. According to Mr. Savin and Mr. Rhodes, the debt secured by the Property was not being paid, but because Mr. Kafka was the sole borrower and the sole owner on title to the Property, only he could deal directly with Chase for purposes of obtaining a loan modification.

The parties were unable to find a new commercial tenant for the Property, so Mr. Kafka eventually moved WOW into the commercial space and his family into the residential space. Mr. Savin discussed with Mr. Kafka the need for him to pay rent and to set these funds aside during the loan modification process, so that if and when they obtained a loan modification, they would have money with which to make secured debt payments and to pay taxes.

Although Mr. Kafka never ended up paying rent, he does appear to have worked with Messrs. Savin and Rhodes to try to obtain a commercial tenant, prior to moving WOW into the Property's commercial space; to reach an agreement with the prior residential tenant as to a rent increase, prior to moving his family into the Property's residential unit; and ultimately, to avoid foreclosure. Several emails between the parties prove this collaboration.

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 12 of 30

On March 24, 2011, Mr. Kafka emailed Mr. Rhodes: "Nathan told Brandon that he would be willing to pay $200 more for rent to help our situation." [Ex. 35.] On October 6, 2011, Mr. Kafka emailed Mr. Rhodes with subject line "1101 Douglas": "I am going to try for the seasonal tenant, just want to keep you in the loop." [Ex. 20.] On January 10, 2012, Mr. Kafka emailed Mr. Savin to confirm that Chase had moved the trustee's sale to March 5th and that Mr. Kafka would continue to try to obtain a loan modification. [Ex. 37.] On September 17, 2012, Mr. Rhodes and Mr. Kafka exchanged emails about property insurance, the Property's heating system, and certain potential fire hazards. [Ex. 34.] On October 11, 2012, Mr. Kafka emailed Mr. Rhodes asking about obtaining insurance for the Property. [Ex. 21.] Mr. Rhodes responded the next day, directing Mr. Kafka to contact Farmers Insurance, ask for Josh, "and tell him the address and it's in my name, but you can change it to your's [sic] I'm sure." [Id.] On October 11, 2013, Mr. Savin emailed Mr. Kafka asking about the loan modification and stating:

> We need you to start paying rent as we agreed when you first moved into the house. That money was meant to be a reserve for when the mortgage and property taxes start up again . . . [Shawn and I] feel that we've been more than fair letting you live and run your business basically rent free for over a year now.

[Ex. 38.]

These emails strongly corroborate the story as told by Mr. Savin and Mr. Rhodes: that, although Mr. Kafka held title to the Property and was the sole borrower on the purchase money debt, the parties did not believe that would always be true. Rather, they repeatedly stated – orally and in writing – that they

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 13 of 30

intended to hold the Property as co-owners and they behaved accordingly.

Perhaps most telling is Mr. Kafka's Declaration of Disclosure, dated January 20, 2011 and presented in his divorce proceeding after NorCal KRS had closed. [Ex. 18.] This disclosure of assets and liabilities, which Mr. Kafka signed under penalty of perjury, does not list the Property as an asset and does not list as liabilities the Chase deeds of trust or the loan from Mr. Phil Savin. [Id.]

Mr. Kafka's former spouse, Ms. Nicole Burleson, testified at her deposition that at no time during their marriage did Mr. Kafka state that he owned the Property, and that if he had in fact owned the Property, she would have owned half of it, too, by virtue of their marriage. [Ex. 42 at 46:13-25.] Ms. Burleson also testified that the Property was purchased in Mr. Kafka's name because he had good credit, but that he took title on behalf of the three of them, and NorCal KRS was formed to maintain the Property. [Id. at 25:5-25, 26:1-11, 27:8-15.]

In sum, Messrs. Savin and Rhodes assert that, although only Mr. Kafka appeared on title to the Property, all three intended that NorCal KRS would own the Property. They never transferred title to NorCal KRS because the company failed before it could refinance the Chase mortgages. Considering the overwhelming evidence corroborating their version of events, their testimony as to feeling "shocked" when Mr. Kafka first claimed to be the sole owner of the Property rings true and quite credible.

### c. Mr. Kafka's Version of Events

Aside from his own testimony, Mr. Kafka principally relied on certain admissions elicited from Messrs. Savin and Rhodes on cross examination. Messrs. Savin and Rhodes conceded that they had nothing in writing to prove either the existence of their partnership or their agreement as to ownership of the Property. They never insisted that Mr. Kafka transfer title to NorCal KRS and readily admitted that they expended no personal funds toward payments of debts secured by the Property or toward the Property's upkeep, while Mr. Kafka continually spent money trying to stave off foreclosure. This latter fact convinced at least Mr. Savin of the fairness of Mr. Kafka's occupation of the Property without paying rent.

According to Mr. Kafka, Mr. Savin and Mr. Rhodes never said they wanted to co-own the Property, having discussed the possibility with Mr. Kafka and deciding they did not want to assume the financial risk. Mr. Kafka also did not recall having a discussion with Mr. Neece, Mr. Deliz, and Messrs. Savin and Rhodes about which one of the three of them would best qualify for a loan to buy the Property. He also claims that they never discussed whether NorCal KRS would own any interest in the Property.

Mr. Kafka's deposition testimony, however, along with a raft of additional evidence, controverts the story he presented at trial. In deposition, Mr. Kafka described a discussion with Mr. McGrath (the attorney helping them incorporate NorCal KRS) regarding the formation of a limited liability company ("LLC"), which would own both the business and the Property. [Ex. 46 at

106:21-25, 107:1-8.]  Mr. McGrath's May 7, 2007 correspondence also refutes Mr. Kafka's narrative, as it states Mr. McGrath's understanding that "you will be equal partners, sharing equally in profit and losses, and that the business will own the real estate wherein it will be located." [Ex. 4 at 1.]  Most convincing is the consistency of the testimony of Messrs. Savin and Rhodes, Mr. Neece, Mr. Johnson, and Ms. Burleson, all of whom confirmed that, from the outset, the parties intended that they would co-own the Property in one form or another.

Despite the weight of evidence to the contrary, Mr. Kafka's view of the discussions prior to the purchase of the Property is, as he stated at trial:  "the conversation was more: 'Jeff, get a property and we'll start a business'."   The court does not find Mr. Kafka's testimony credible; rather, it finds and concludes based on the clear and convincing evidence presented that the parties intended that NorCal KRS would eventually own the Property or that they would somehow co-own it.  The facts that Mr. Kafka served as the sole borrower of most of the funds used to purchase the Property and that only his name appeared on title to the Property were proven to be conveniences – means to the intended end.

Mr. Kafka also presented a different explanation as to the loan from Mr. Phil Savin.  According to Mr. Kafka, Mr. Phil Savin loaned him that $65,000 personally, and he was solely liable.  According to Mr. Kafka, Mr. Phil Savin contacted him, apparently out of the blue, and asked if he wanted to borrow $65,000.  Mr. Kafka understood that he was to deposit the funds in his bank account to demonstrate financial wherewithal to Chace.

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 16 of 30

Ultimately, Mr. Kafka conceded that he used that money for the down payment on the Property.  Mr. Kafka also claimed ignorance of the fact that, before it shut down, NorCal KRS was making interest payments on the Savin loan.  Mr. Kafka recalls first discussing repayment of the $65,000 loan some two years after he borrowed the money, when Mr. Phil Savin insisted Mr. Kafka start making payments.

Mr. Kafka's version of events with respect to the Savin loan makes no sense to the court.  It defies logic to suggest that Mr. Phil Savin would approach Mr. Kafka – a virtual stranger – and offer to loan him a large sum of money, particularly as part of a transaction in which his son (Mr. Savin) would obtain no real benefit.  It further defies logic to suggest that, having loaned $65,000 to someone he barely knew, Mr. Phil Savin would wait two years before insisting that his borrower make payments.[10]

Mr. Kafka offers no credible explanation for NorCal KRS having claimed the Savin loan as a liability on its balance sheet, a document he was proven to have seen.  [Ex. 17 at 2.]  He also fails to explain why NorCal KRS would make payments on the Savin loan if it was personal to Mr. Kafka.  [Ex. 11 at 2 (Mr. Phil Savin's loan payment record).]  And Mr. Kafka offers no plausible explanation as to why, once he started making payments to Mr. Phil Savin, those payments would amount to approximately

---

[10] Mr. Kafka also testified that did not know that NorCal KRS borrowed an additional $50,000 from Mr. Phil Savin and did not learn of the second loan until this adversary proceeding.  He states that he never agreed to borrow the $50,000 and does not believe he is liable for that loan.  As it is not material to the issue at hand, the court declines to make any findings with respect to this alleged $50,000 loan.

one third of the $527.00 amount due. [Ex. 33 (check payment to Mr. Phil Savin by Mr. Kafka in the amount of $177).] Finally, Mr. Kafka offers nothing to refute Mr. Phil Savin's highly credible testimony that he would not have made the loan to help Mr. Kafka purchase the Property for himself.[11] The court finds and concludes based on the clear and convincing evidence presented that Mr. Phil Savin loaned the $65,000 not to Mr. Kafka personally, but to the partnership and soon-to-be-formed NorCal KRS for the purpose of purchasing the Property for the parties' joint venture.

Mr. Kafka urged the court to accept his version of events by claiming to have contributed approximately $3,000 to 5,000 of personal funds toward the purchase of the Property, which may have been for some "other cost for escrow." But the title company's Final Closing Statement [Ex. 2] reflects no contribution from Mr. Kafka. Accordingly, the court finds and concludes that Mr. Kafka made no such contribution.

As to the "[Et Al]" notation on the Purchase Agreement, Mr. Kafka explained that this was done in case his then-wife, Ms. Burleson, wanted to be on title, too. The court does not find Mr. Kafka's testimony credible in light of Ms. Burleson's understanding that Mr. Kafka purchased the Property on behalf of himself and Messrs. Savin and Rhodes and, more importantly, in light of Mr. Neece's testimony that the purpose of the "[Et Al]" notation was to allow for Messrs. Savin and Rhodes to be included in the Purchase Agreement. The court finds that the "[Et Al]"

---

[11] The court also notes that the Mr. Phil Savin made the $65,000 check payable to WOW, not to Mr. Kafka individually. [Ex. 8.]

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 18 of 30

notation on the Purchase Agreement was placed there to allow Messrs. Savin and Rhodes to be included in the Purchase Agreement, consistent with the parties' intent that all three would own the Property through their business.

According to Mr. Kafka, NorCal KRS paid the debts secured by the Property, paid for renovations, and paid taxes, insurance and other costs as his tenant; i.e., that NorCal KRS paid the foregoing expenses as rent. If that story were true, one would expect a written lease, but none existed. Mr. Kafka also conceded that he did not report any rental income from the Property on his tax returns. And although Mr. Kafka claimed not to have known that NorCal KRS reported the Property on its tax returns, other evidence proved that Mr. Kafka received copies of those returns[12] and was present at meetings with Messrs. Savin and Rhodes where he received NorCal KRS balance sheets showing the Property as an asset of the business.

On this point, the testimony of every other witness refutes Mr. Kafka's story, especially that of Mr. Rhodes, who testified that Mr. Nathan Rhodes paid rent for the residential unit directly to NorCal KRS – rather than to Mr. Kafka. The evidence introduced at trial proves that Mr. Kafka did not lease the Property to NorCal KRS, and that NorCal KRS paid Property-related expenses based on the parties' understanding that they were partners and de facto co-owners and would eventually sort out the financing and title issues in a way that comported with that understanding.

---

[12] See Ex. 12: NorCal KRS 2008 tax return with cover letter addressed to Messrs. Savin, Rhodes, and Kafka.

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 19 of 30

In an attempt to refute the allegations that the parties intended to refinance the purchase money loans on the Property and to become jointly liable or liable through NorCal KRS on the refinanced debt, Mr. Kafka initially testified that he did not know why Mr. Hotz was trying to obtain a loan in 2008. After being confronted with the 2008 emails from Mr. Hotz [Exs. 25-26], which were addressed to all three parties and which discussed obtaining two loans for NorCal KRS – one to refinance the Property and one for operating capital – Mr. Kafka changed his tune. Mr. Kafka's shifting story only provides more support for the court's conclusion that Messrs. Savin and Rhodes' version of event constitutes the truth.

After NorCal KRS vacated the Property, Mr. Rhodes helped Mr. Kafka look for tenants, obtain insurance, and put Mr. Kafka in contact with Mr. Neece to explore other options to save the Property from foreclosure. Mr. Kafka attests that Mr. Rhodes did this purely out of friendship. The court does not find this explanation credible, for several reasons.

First and foremost, several of the email exchanges regarding these issues included Mr. Savin, whose collaborative motivation Mr. Kafka makes no effort to explain. [Exs. 34, 36 (Mr. Kafka asks that the email be forwarded to Mr. Savin), 37-39.] Second, Mr. Savin's email to Mr. Kafka, stating that he and Mr. Rhodes want him to start paying rent for his use of the Property demonstrate that Messrs. Savin and Rhodes remained involved due to their pecuniary interest, not out of friendship. [Ex. 38.] Finally, Mr. Kafka refers repeatedly in correspondence to the parties' common interests. This pattern of reference continued

at least until a January 10, 2014 email, in which Mr. Kafka appears to refer to the Property for the first time as solely his. [Ex. 39.]  The evidence offered as to the parties' long-standing course of conduct convinces the court that all three parties persisted in their pattern of treating the Property as a joint venture long after NorCal KRS closed and further undercuts Mr. Kafka's version of events.

Perhaps the most persuasive evidence introduced at trial was Mr. Kafka's Declaration of Disclosure, submitted in his divorce proceedings.  [Ex. 18.]  This document identifies Mr. Kafka's interest as a "Partner of NorCal Brand Inc." and discloses that company's debt, totaling $1.2 million.  At trial, Mr. Kafka clarified that "NorCal Brand Inc." was NorCal KRS and that the $1.2 million debt consisted of the debts to Chase secured by deeds of trust on the Property.

Mr. Kafka also attempted to portray Declaration of Disclosure introduced at trial as an early draft, and one that differed materially from a final version.  For example, Mr. Kafka testified that, in a later version of the document, he disclosed the Property as an asset and that he paid Ms. Burleson $25,000 to settle her claim to an interest in the Property.  But Mr. Kafka did not seek to introduce a different version of the Declaration of Disclosure at trial and did not seek to introduce any corroborating evidence to prove this alleged payment to Ms. Burleson.  Based on gaping holes in Mr. Kafka's story and the consistent, credible testimony of every other testifying witness – many of whom had no interest in the outcome of the trial – the

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 21 of 30

court finds and concludes that story told by Messrs. Savin and Kafka constitutes the truth.

### d. Summary of Factual Findings

The court finds and concludes that prior to, during, and after the purchase of the Property, the parties intended to own the Property jointly, whether as individuals or through NorCal KRS; that Phil Savin loaned the parties $65,000 for the purpose of buying the Property; and that Mr. Kafka held title to the Property individually solely for the convenience of the parties at the time of the purchase of the Property. The court also finds that the parties always intended to transfer the Property out of Mr. Kafka's name once they arranged financing to replace the purchase money financing, but that the business failed before the parties could refinance the debt. Finally, the court finds that there was no rental agreement – oral or otherwise – between NorCal KRS and Mr. Kafka, and that NorCal KRS paid the carrying costs of the Property and the cost of renovations based on the parties' understanding that the Property constituted a jointly-owned asset.

## IV. CONCLUSIONS OF LAW

Having reached the foregoing factual conclusions, the court now turn to Messrs. Savin and Rhodes' legal arguments: that Mr. Kafka holds the Property in a resulting trust for the benefit of NorCal KRS, or for the parties' respective individual benefit.[13]

---

[13] Messrs. Savin and Rhodes seek declaratory relief through their first cause of action. [Complaint; Dkt. 1 at 4, ¶¶ 18-20.] Messrs. Savin and Rhodes assert "that they are general partners in a general partnership and that such general partnership is the equitable owner of the Burlingame Property." [Id. at ¶ 19.] In the prayer for relief, however, Messrs. Savin and Rhodes ask, with respect to their first cause of action, "[f]or a judicial declaration

Mr. Kafka asserts that he is the sole owner of the Property, that Messrs. Savin and Kafka have no writing to show that they have an interest in the Property, and that they cannot meet their burden of showing by clear and convincing evidence that a resulting trust exists.

### a. Resulting Trust

"Under California law a resulting trust is implied by operation of law whenever a party pays the purchase price for a parcel of land and places the title to that land in the name of another.  The trust is presumed to result in favor of the person who paid the purchase price.  A resulting trust is exempt from the statute of frauds."  Torrez v. Torrez (Matter of Torrez), 63 B.R. 751, 754 (B.A.P. 9th Cir. 1986), aff'd sub nom. In re Torrez, 827 F.2d 1299 (9th Cir. 1987) (citing Jones v. Gore, 141 Cal. App. 2d 667, 673 (1956)); Martin v. Kehl, 145 Cal. App. 3d 228, 238 (1983)).

---

that Plaintiffs are general partners in NorCal KRS and either that NorCal KRS is the 100% equitable owner of the Burlingame Property, **or Plaintiffs each own a one-third share of the Burlingame Property**."  [Id. at 12 (emphasis added).] Messrs. Savin and Rhodes did not argue in favor of the existence of a general partnership at trial.  Instead, they pursued the theory that the parties each own one third of the Property in their individual capacities based on a resulting trust.  Both sides argued the legal theory of a resulting trust in their trial briefs.  To the extent that the Complaint did not expressly assert a resulting trust theory, the court will deem the Complaint amended to conform to the proof introduced at trial.  Fed. R. Civ. P. 15(b)(2) (made applicable by Rule 7015) ("[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move--at any time, even after judgment-- to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue"); Frito Co., W. Div. v. N. L. R. B., 330 F.2d 458, 465 (9th Cir. 1964) ("[i]t is a judicial function to permit an amendment of the complaint to conform to proof admitted without objection.  The matter of allowance of such an amendment is addressed to the discretion of the court").

The purpose of a resulting trust is to carry out the intention of the parties; "it is implied from the facts, and neither written evidence of agreement nor fraud . . . is an essential element." Laing v. Laubach, 233 Cal. App. 2d 511, 515 (1965).

> [A] resulting trust arises from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest. It has been termed an 'intention-enforcing' trust, to distinguish it from the other type of implied trust, the constructive or 'fraud-rectifying' trust. The resulting trust carries out the inferred intent of the parties; the constructive trust defeats or prevents the wrongful act of one of them.

In re Sale Guar. Corp., 220 B.R. 660, 664 (B.A.P. 9th Cir. 1998), aff'd, 199 F.3d 1375 (9th Cir. 2000) (quoting American Motorists Ins. Co. v. Cowan, 127 Cal. App. 3d 875 (1982)). Persons who claim a beneficial interest in a resulting trust need not have made payment or payments at or before the execution of the conveyance of the property to the person who holds title to the property. Viner v. Untrecht, 26 Cal. 2d 261, 270, 158 P.2d 3 (1945).

The party asserting the existence of a resulting trust bears the burden of proof by clear and convincing evidence. Gomez v. Cecena, 15 Cal. 2d 363, 367 (1940).

Messrs. Savin and Rhodes cite to Stone v. Lobsien, 112 Cal. App. 2d 750, 752-53 (1952); In re Marriage of Ruelas, 154 Cal. App. 4th 339, 343 (2007); and Torrez v Torrez (In re Torrez), 827 F.2d 1299 (9th Cir. 1987) to support their assertion that a resulting trust exists.

In Stone, Mr. and Mrs. Stone did not have adequate credit to buy a house. Stone at 752-53. The price of the house they

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 24 of 30

wished to purchase was $1,955, which required a $255 down
payment.  Id. at 753.  The balance of the purchase price would be
secured by a note and deed of trust calling for payments of
$17.50 per month.  Id.  Because of the Stones' poor financial
condition, the seller asked for additional collateral.  Id.
Defendant Ms. Lobsien, a close friend of the Stones, agreed to
provide that collateral in exchange for being identified as an
owner of the property on its title.  Id.  Ms. Lobsien also signed
a grant deed conveying the property to the Stones.  Id.

The Stones took possession of the grant deed executed by Ms.
Lobsien – which they intended to record once they had paid off
the entire debt secured by the property – paid the deposit and
moved into the house.  Id.  Thereafter, they made all installment
payments, paid the taxes, and paid for maintenance of the
property.  Id.

Mr. Stone died and, while Mrs. Stone attended his funeral,
Ms. Lobsien entered the house and removed all of the property-
related papers, including the unrecorded deed.  Id. at 754.  Ms.
Lobsien refused to return these papers and litigation ensued.
Id.  Ms. Lobsien asserted that she owned the property because she
held title to it, and that the payments the Stones made with
respect to the property were a form of rent.  Id.  Applying the
resulting trust doctrine to these facts, the trial court ruled,
and the appellate court affirmed, that Ms. Lobsien held title to
the property in trust for Ms. Stone and ordered Ms. Lobsien to
reconvey the property to Ms. Stone.  Id.

In Ruelas, Mr. and Mrs. Hernandez entered into an agreement
to buy a condominium.  Ruelas at 341.  Because they did not have

good credit, their daughter, Michelle Ruelas, obtained a loan and took title to the condominium.  Id.  At the time, Ms. Ruelas was married to Mr. Ruelas.  Id.  Mr. Ruelas wrote a check for the down payment; the funds for the down payment, however, were provided by Mrs. Hernandez's brother.  Id.  Mr. Hernandez opened a bank account for Ms. Ruelas at his credit union and each month deposited funds to pay the mortgage and impounds, which Ms. Ruelas did.  Id.  Mr. and Mrs. Hernandez took interest deductions for the mortgage; Ms. Ruelas did not.  Id.

During the Ruelas' divorce proceedings, Mr. Ruelas asserted that the condominium was a marital asset; Ms. Ruelas did not. Id.  The trial court awarded title of the property to Mr. and Mrs. Hernandez.  Id. at 342.  The appellate court affirmed, stating:  "[i]n sum, we find that, much like in Stone v. Lobsien . . . the facts show that there is a resulting trust in favor of the Hernandezes.  Indeed, it could be said that this case comes close to a paradigm of a resulting trust."  Id. at 345 (internal citations omitted).

In Torrez, Mr. and Mrs. Torrez made a down payment on real property and executed a deed of trust.  Torrez at 1299.  They put title to the property in their son's and his wife's ("Debtors") names, however, to obtain more than their fair share of irrigation water through a federally subsidized program.  Id. Mr. and Mrs. Torrez made all of the mortgage payments, paid the property taxes, improved the property, and hired a person to farm the land.  Id. at 1299-1300.

Several years later, Debtors took out a bank loan secured by the property.  Id. at 1300.  Mr. and Mrs. Torrez repaid the loan

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 26 of 30

in full.  Id.  Debtors began to have financial problems, so Mr. and Mrs. Torrez had them transfer title to the property to another sibling for no consideration.  Id.

Debtors eventually filed Chapter 11 and sought a reconveyance of the property from the sibling so that they could sell the property to fund their plan.  Mr. and Mrs. Torrez filed a counterclaim to quiet title, asserting that the land was held in either an express oral trust or a resulting trust in their favor. Debtors argued that if any such trust existed, it was void because the trust had the illegal purpose of obtaining subsidized irrigation water beyond the allowable limit.  Id.  The Ninth Circuit rejected the illegality argument and held that Debtors had no more than bare legal title to the property, and that a valid resulting trust existed for the benefit of Mr. and Mrs. Torrez.  Id. at 1303.

In response, Mr. Kafka argues that, unlike the ne'er do wells in the cases cited by Messrs. Savin and Rhodes, Mr. Kafka was a bona fide purchaser and that "[Messrs. Savin and Rhodes] made no effort to specify how, when, what, or if they would become owners.  They received a net benefit by paying Defendant's mortgage instead of higher market rent.  When the business failed, they abandoned the property and mortgage payments." [Def.'s Trial Brief; Dkt. 28 at 4.]

**b. Discussion**

The court finds the Stone, Ruelas, and Torrez cases particularly instructive as, like here, title to the properties were put in the name of a third party who had the necessary credit.  The evidence shows clearly and convincingly that Messrs.

Kafka, Savin, and Rhodes intended to buy the Property together, and that the only reason Mr. Kafka took title to the Property was because he had the credit needed to obtain a loan.  Mr. Kafka did not contribute anything to the purchase price.  The down payment was funded by a loan from Mr. Phil Savin that NorCal KRS repaid until it folded, after which Messrs. Kafka, Savin, and Rhodes each became responsible for one third of the loan payment.

After the Property was purchased, Messrs. Kafka, Savin, and Rhodes continued act in a manner consistent with their intent to jointly own the Property:  they tried to obtain a loan so that NorCal KRS could pay back the money Mr. Kafka borrowed and for which the Property served as collateral; NorCal KRS collected rent from Nathan Rhodes and paid all costs associated with the Property; and NorCal KRS reported the Property on its tax returns and included it in its balance sheets.

After NorCal KRS failed, the debt secured by the first deed of trust went unpaid.  Mr. Kafka asserted that he made payments on the debt secured by the second deed of trust, but he did not introduce any evidence of those payments.[14]  Mr. Kafka also expended additional sums in an effort to avoid foreclosure.  Mr. Savin and Mr. Rhodes argue, and the court agrees, that it was reasonable for Mr. Kafka to service the debt secured by the second deed of trust and to try to avoid foreclosure, as he had moved his business and residence to the Property and was not otherwise paying rent.

_____

[14] See FN 8.

Case: 17-03060   Doc# 42   Filed: 11/21/18   Entered: 11/21/18 11:22:19   Page 28 of 30

The evidence clearly and convincingly shows that, contrary to Mr. Kafka's assertion that they abandoned the Property after NorCal KRS folded, Messrs. Savin and Rhodes remained actively involved and concerned about possible foreclosure. Mr. Kafka regularly communicated with them about his efforts to obtain a loan modification, to avoid foreclosure, to obtain new tenants, and when he might be able to start paying rent. Mr. Kafka did not include the Property in his 2011 Declaration of Disclosure in his divorce proceeding and did not declare any of the purported rental income from NorCal KRS on his personal tax return. The court concludes that Messrs. Kafka, Savin, and Rhodes intended to own the Property together for their business purposes before, during, and after the Property was purchased in Mr. Kafka's name; and that Mr. Kafka held title to the Property in a resulting trust in favor of all three parties, equally.

**V.    CONCLUSION**

For the foregoing reasons, the court rules in favor of Messrs. Savin and Rhodes on their claim for declaratory relief and finds that they and Mr. Kafka are entitled to equitable one-third interests in the Property, which Mr. Kafka, as holder of bare legal title, holds in a resulting trust for the benefit of all three parties.

**\*\*END OF ORDER\*\***

## Court Service List

[None]